**CAFETERIA AND RESTAURANT WORKERS UNION, LOCAL 473, AFL–CIO, et al., Appellants,**

v.

**Neil H. McELROY, Individually and as Secretary of Defense, et al., Appellees.**

**No. 14689.**

United States Court of Appeals District of Columbia Circuit.

Argued Nov. 9, 1959.

Decided April 14, 1960.

---

Mr. Bernard Dunau, Washington, D. C., for appellants.

Asst. Atty. Gen. J. Wattes Yeagley, of the bar of the Supreme Court of Indiana, pro hac vice, by special leave of court, with whom Messrs. Leo J. Michaloski, Jerome L. Avedon, and Justin R. Rockwell, Attys., Dept. of Justice, were on the brief, for appellees. Mr. George B. Searls, Atty., Dept. of Justice, also entered an appearance for appellees.

Before PRETTYMAN, Chief Judge, and EDGERTON, WILBUR K. MILLER, BAZELON, FAHY, WASHINGTON, DANAHER, BASTIAN and BURGER, Circuit Judges.

PRETTYMAN, Chief Judge.

Rachel M. Brawner was a short-order cook—a "breakfast cook". In November, 1956, she worked in a cafeteria. Her duties were to prepare breakfast and lunch, attend the steam table, and wash dishes. She had been so employed for six and a half years. The cafeteria is located on Government property, the premises of the Naval Gun Factory. The land had been purchased by the United States in 1873. It is located in the District of Columbia and became part of the Gun Factory in 1945. The work of the Factory includes, *inter alia*, design, planning, production and inspection of naval ordnance.

The cafeteria was operated by a private corporation, M & M Restaurants, Inc., under a written contract with the Board of Governors, U. S. Naval Gun Factory Cafeterias. The Board of Governors is composed of seven civilian governmental employees of the Factory and is appointed by the Superintendent. M & M Restaurants, Inc., operates numerous cafeterias and restaurants in several states, including Delaware, Maryland and Virginia. It operates the three main cafeterias at the Gun Factory. In order to enter or leave the premises of the Gun Factory, an identification badge is required. The issuance of this badge is by the Security Officer of the Gun Factory, a subordinate of the Superintendent, both of whom are naval officers. The Gun Factory is a component activity of the Potomac River Naval Command. The Commandant of this Command is directly responsible to the Chief of Naval Operations.

Rachel Brawner was required to have, and did have, an identification badge. On November 15, 1956, she was notified by her supervisor that he had been told to pick up her badge "for security reasons". She surrendered her badge to him. This action of the supervisor was pursuant to a phone call from a representative of the Board of Governors to a representative of M & M Restaurants, Inc. The caller stated that the Board had been notified by the Security Officer of the Naval Gun Factory, a Lieutenant Commander, that Brawner would have to surrender her badge and would not be permitted to enter the Factory "until clearance is certified by the Security Officer."

The President of M & M Restaurants, Inc., offered Brawner employment at the Skylark Motel in nearby Springfield, Virginia, where a restaurant was operated by the company. The representative of the Union, on behalf of Brawner, notified the company that she was not interested in accepting the proffer.

The Chairman of the Board of Governors made a request of the Superintendent of the Factory that a meeting be arranged for the Security Officer, the Board of Governors, representatives of M & M Restaurants, Inc., and agents of the Union to discuss the action relative to Brawner. The Superintendent replied that the agreement between the Board of Governors and M & M Restaurants, Inc., stipulated that the latter should employ only those who met the security requirements for admission to the Factory and that it was considered that Brawner "does not meet these security requirements". The Superintendent added that the proposed meeting was therefore unnecessary.

In the meantime Brawner had called upon the business agent of the local of the Union which was the bargaining representative of the cafeteria workers. This representative discussed the matter with the President of M & M Restaurants, Inc. The contract between the Union and the company provided that the employer would not suspend or discharge any employee without good and sufficient cause.[1] It further provided that in the event of a dispute the matter should be referred to a board of arbitration of three parties, one of whom might be chosen by the American Arbitration Association.[2] The representative of the Union was informed by the President of the company that he could not supply any information concerning the taking of Brawner's badge. Thereupon the dispute was referred to a board of arbitrators composed of John B. Cullen, Esquire, named by the company, Samuel H. Jaffee, Esquire, named by the Union, and the Honorable Nathan Cayton, named by the American Arbitration Association. These arbitrators, Mr. Jaffee dissenting, found: "The evidence before us does not establish that Rachel Brawner was ever discharged by the Company. There was no evidence from which it can be said that the Company ever indicated any desire or intention to terminate or dispense with her services." The arbitrators further pointed out: "The real grievance of the employee and of her Union has never been against the Company; it has been and is against those who have (wrongfully, she contends) denied her physical access to the place of her employment."

In sum the facts are that Rachel Brawner, a short-order cook employed by the civilian concessionaire operator of a cafeteria located on the premises of the Naval Gun Factory, was denied retention of the identification badge which had permitted her to enter the premises where she worked, the denial being by the authority of the naval officer in command of the Factory. The stated reason was that she failed to meet security requirements. She was not informed as to the factual premises for the conclusion. No charge was made against her.

1. Clause 6 of the agreement between M & M Restaurants, Inc., and the Union contained the following: "The Employer agrees not to suspend or discharge any employee without good and sufficient cause."

2. Clause 24 of the agreement provided: "The parties agree that they will endeavor to adjust any dispute that may arise from the interpretation or application of this Agreement within a period of 48 hours. In the event that no accord can be reached, the matter in dispute shall be referred to a Board of Arbitration within two days from the date which the parties to the Agreement shall fail to reach an agreement in connection with the matter in dispute, and said Board of Arbitration shall be composed of one representative of the Employer and one representative of the Union, and one disinterested party chosen by the two said members of the Board of Arbitration. In the event the two parties shall fail to agree on a third disinterested party, the parties agree that the American Arbitration Association be requested to appoint a person to serve in the capacity of the third and impartial arbitrator."

After the foregoing events the Union and Mrs. Brawner filed a civil action in the District Court against the Secretary of Defense and other Government officials, in their individual and official capacities, and M & M Restaurants, Inc., for a declaratory judgment, injunctive relief, vacation of the arbitration award, and recovery of damages. The District Court granted summary judgment for the Government defendants and dismissed the complaint as to all defendants. This appeal followed.

## I. The Problem Stated

The problem to be solved is a narrow one. It concerns the nature and extent of the power of a naval officer in command of a naval installation to control the ingress and egress of civilians to and from the premises. The discussion on the briefs and in argument has gone far afield from this problem. The case does not involve debarment from a chosen occupation. It is not a discharge case. The case does not involve any Personnel Security Program, with its concomitant regulations.

## II. Power to Control Access to Naval Gun Factory

*Line of Authority.*

We first examine the authority of the Navy to prescribe rules for the admission of civilians to Navy installations. The authority begins with the Constitution.

"The Congress shall have power to dispose of and make all needful * * * regulations respecting the territory or other property belonging to the United States; * *." [3]

"The Congress shall have the power * * *;

\* \* \* \* \* \*

"To exercise exclusive legislation in all cases whatsoever, over such district (not exceeding ten miles square) as may, by cession of particular States, and the acceptance of Congress, become the seat of the government of the United States, * * *." [4]

"The Congress shall have the power * * *;

\* \* \* \* \* \*

"To provide and maintain a navy;

"To make rules for the government and regulation of the land and naval forces; * * *." [5]

The line of authority then proceeds by statutes.

"The Secretary of the Navy has custody and charge of all * * * property of the Department." [6]

"The head of each department is authorized to prescribe regulations, not inconsistent with law, for * * the custody, use, and preservation of * * * property appertaining to it." [7]

"United States Navy Regulations shall be issued by the Secretary of the Navy with the approval of the President." [8]

Next in this line of authority come certain United States Navy Regulations issued pursuant to Section 1547 of the

---

3. Art. IV, § 3, cl. 2.

4. Art. I, § 8, cl. 17.

5. Art. I, § 8, cls. 13, 14.

6. 10 U.S.C. § 5031(c), which was 5 U.S.C. § 413, which was R.S. § 418, derived from an Act of April 30, 1798, ch. 35, § 3, 1 Stat. 554.

7. This section now appears as 5 U.S.C.A. § 22 (1958). It was R.S. § 161, derived from a number of Acts, beginning with one of July 27, 1789, ch. 4, 1 Stat. 28. It was amended in respects not here material by Pub.L. No. 619, 85th Cong., 2d Sess. (Aug. 12, 1958), 72 Stat. 547.

8. 10 U.S.C. § 6011 (1958). This was 34 U.S.C. § 591, the source of which was R.S. § 1547. In addition 10 U.S.C. § 121 (1958) provides: "The President may prescribe regulations to carry out his functions, powers, and duties under this title." This "title" of the United States Code was revised, codified and enacted into law by statute, being Pub.L. No. 1028, 84th Cong., 2d Sess., ch. 1041 (Aug. 10, 1956), 70A Stat. 1.

Revised Statutes.[9] They were issued by the Secretary of the Navy, the Honorable John L. Sullivan, and approved on that same day by the President, the Honorable Harry S. Truman. These Regulations contain the following provisions:

"The responsibility of the commanding officer for his command is absolute, except when, and to the extent, relieved therefrom by competent authority, or as provided otherwise in these regulations." [10]

"In general, dealers or tradesmen or their agents shall not be admitted within a command, except as authorized by the commanding officer:

\* \* \* \* \* \*

"3. To furnish services and supplies which are necessary and are not otherwise, or are insufficiently, available to the personnel of the command." [11]

"The commanding officer shall require that orders and regulations pertaining to the security of \* \* \* classified \* \* \* material \* \* \* are strictly observed." [12]

"Definitions.

"1. *'Classified matter.'*—Information or material in any form or of any nature which in the public interest must be safeguarded in the manner and to the extent required by its importance." [13]

"Subject to law and as may be prescribed by the Secretary of the Navy, it shall be the duty of the Chief of Naval Operations to:

\* \* \* \* \* \*

"12. Prepare and issue manuals and other appropriate publications containing orders, instructions, and procedures, conforming to these reg-

ulations, and pertaining to matters for which he is responsible." [14]

"The Chief of Naval Operations shall supplement these regulations with appropriate publications including the Security Manual, \* \* \*." [15]

The United States Navy Security Manual for Classified Matter, promulgated October 2, 1954, contained the following:

"Persons who are considered visitors \* \* \* are divided into four basic categories which are further subdivided as follows:

"*Category United States citizens*
\* \* \*

*One*

\* \* \* \* \* \*

"Baker Personnel of private fa-
[meaning cilities under contract
(B)] to the Department of
 Defense." [16]

"The commanding officer of the activity being visited has full discretion as to whether or not the visit shall be permitted." [17]

The U. S. Navy Physical Security Manual promulgated by the Chief of Naval Operations on April 14, 1956, contained the following:

"Definitions

"1. *Naval Activity.* A naval activity shall be construed to mean a unit of the Naval Establishment, of distinct identity, and established under an officer in command or in charge.

\* \* \* \* \* \*

"3. *Facility.* A facility, for purposes of this instruction, is any building, shop or utility within an activity having a specific function." [18]

9. 34 U.S.C. § 591, codified Aug. 10, 1956, as 10 U.S.C. § 6011.

10. Regs. § 0701.

11. Id. § 0734.

12. Id. § 0713.

13. Id. § 1501.

14. Id. § 0204.

15. Id. § 1502.

16. Security Manual § 1403.

17. Id. § 1409.

18. Physical Security Manual § 0100.

*"The Commanding Officer.* The Commanding Officer is responsible for the security of all property and installations within his command. He prescribes the security measures to be adopted, and coordinates when necessary, the measures adopted by subordinates, but he alone remains responsible for the overall security of his command." [19]

*"The Security Officer.* Normally, the Commanding Officer delegates most of the administrative and operational aspects of security to a subordinate, who is referred to in this manual as the Security Officer. The functions of this officer include planning, supervision, inspection, coordination, and submission of recommendations with respect to:

"a. Physical security

"(1) Internal security

\*　　\*　　\*　　\*　　\* " [20]

*"Specific duties.* The planning, supervision and coordination of matters relating to the security of the command includes:

"a. *Internal security matters:*

"(1) Safeguarding from \* \* the unauthorized disclosure of classified matter." [21]

■■ It is argued by the Union that these Navy regulations and manuals were not published in the Federal Register pursuant to the requirements of Section 3 of the Administrative Procedure Act [22] and the Federal Register Act [23] and thus were not valid. The section of the Administrative Procedure Act providing for publication begins:

"Except to the extent that there is involved (1) any function of the United States requiring secrecy in the public interest \* \* \*—

"(a) Every agency shall \* \* publish in the Federal Register [etc.]."

Certainly the operation of an agency for the design, planning and production of naval guns and other ordnance is a function requiring secrecy in the public interest. The Attorney General's Manual on the Administrative Procedure Act cites as an illustration of the meaning of the provision: "Thus, the War Department obviously is not required to publish confidential matters of military organization and operation \* \* \*." Therefore, in so far as these regulations apply to the Naval Gun Factory, they need not be published in order to establish their validity. We are not concerned with their validity in any other application. Furthermore the provision of the Act to which we have referred excepts from publication "any matter relating solely to the internal management of an agency". In so far as these regulations prescribe the authority of the commanding officer over an installation such as the Gun Factory, they relate to the internal management of the Navy. The public effect is remote. The Committee Reports on the Bill which became the Administrative Procedure Act point out that the publication provisions were intended to make available to the general public such administrative operations and procedures as are public property. The authority of naval officers over naval operations can hardly be classified as public property. In so far as the Federal Register Act is concerned, no act of Congress required publication; the Navy regulations had not been designated by the President as applicable to the general public; and thus were not required by this statute to be published.

It therefore seems clear that naval officers in command of naval installations have ample authority to control the ingress and egress of civilians to and from the premises of the command.[24]

19. Id. § 0154.

20. Id. § 0156.

21. Id. § 0156.3.

22. 60 Stat. 238 (1946), 5 U.S.C.A. § 1002.

23. 49 Stat. 501 (1935), 44 U.S.C.A. § 305 (a) (2).

24. The Congress has recognized the existence of such authority by prescribing penalties for the unauthorized entrance

*The Exercise of Authority.*

The contract made October 1, 1955, between the Board of Governors of the Naval Gun Factory Cafeterias and M & M Restaurants, Inc., provided in part:

"* * * In no event shall the Concessionaire engage, or continue to engage, for operations under this Agreement, personnel who

\* \* \* \* \* \*

"(iii) fail to meet the security requirements or other requirements under applicable regulations of the Activity as determined by the Security Officer of the Activity." [25]

In answer to an interrogatory posed in this lawsuit by the plaintiffs to the defendants concerning the procedure followed by the officials of the Naval Gun Factory to determine whether a civilian, non-Governmental employee should be given an identification badge, the Governmental defendants answered that each applicant for an identification badge was required to complete an application form which contained the following: "I agree to obey all Naval Gun Factory Regulations * * *." The execution of such an undertaking by Brawner is implicit and not denied.

 Not only do the Government officers have technical authority to protect the privacy of premises such as a naval gun factory, but the right to do so is a right of the highest priority in the public interest. No one, we think, would question that right or its priority. Certainly the realisms of the world situation dictate its necessity. On the other hand, no individual citizen has a natural or inherent right to enter such premises. And we find no statute which confers

such a right upon civilians. The only right of entrance possessed by a civilian is a right gained by contract or by specific permission. Brawner's only right to enter the Gun Factory was a right which she gained by way of her contract of employment. It was derived from a combination of two contracts, one between the Government and her employer and the other between her employer and her. Brawner's only right of entrance was subject to the flat, unequivocal contract provision that employees permitted entrance to the Factory must meet the security requirements of the command. We do not see how a contract right of an employee of a contractor with respect to the subject matter of the contract can be superior to the rights of the contractor in respect to that subject matter. If the rights of a contractor-employer are subject to limitations, the rights of employees under the contract are subject to the same limitations.[26] Thus, for example, if a contract specifies a 40-hour work-week, no individual employee has a right to demand employment for 60 hours a week. Moreover we know of no rule of law or custom which requires that employees be informed of the terms of the employer's contract, to which they are not parties but by virtue of which they gain their employment.

Thus it clearly appears that the commanding officer at the Factory had a high priority right to protect entrance to the Factory and the civilian Brawner had merely a right derived from a contract which specifically provided that she must meet the security requirements of the officer. This being the situation, we fail to perceive any limitation upon the discretion of the commanding officer in re-

upon such naval installations. See, e. g., 62 Stat. 765 (1948), 18 U.S.C. § 1382 (1958); 64 Stat. 1005 (1950), 50 U.S. C.A. § 797.

25. Sec. 5(b). The predecessor contract, of December 1, 1949, in effect when Brawner was employed, provided in Art. IX(b): "Approval for the employment of any person by the Concessionaire to work in the Naval Gun Factory * * * shall be conditioned upon the right of the

Superintendent, or his duly designated representative, to cancel, revoke or withdraw the same for any cause or reason deemed sufficient by the Superintendent, or his representative, in the exercise of discretion, without the necessity for any showing of cause."

26. 2 Williston, Contracts § 364A & n. 5 and cases there collected (3d ed. 1959); id. § 394.

spect to civilian presence within his command, except limitations imposed by higher naval authority. We find no rights of the public, or of any member thereof, which act as a restriction upon the otherwise unfettered discretion of naval officers in such a matter.

The contract between M & M Restaurants, Inc., and the Government contained no provision relating to procedure upon the denial of access to the Factory by an employee, but the contract between Brawner (via her representative, the Union) and her employer did provide a procedure in respect to disputes under that contract. It provided for arbitration. As we have seen, she was afforded that full procedure. She has had the full of her contractual procedural rights.

III. Power to Control Access versus Claimed Right to Employment at Naval Gun Factory

It is argued in Brawner's behalf that her right to employment was involved in her right to be daily upon this particular site; that this right to employment was a protected right; and that this protection reached through to create a protected right to be at a particular site of employment. We think principles applicable to employment as such are not applicable to the case we have before us. We discuss those principles only because they are pressed upon us and we think they reflect some erroneous premises which we are in duty bound to indicate.

*Employment—a Qualified Right.*

In the first place it is obvious that no one has an unqualified right—inherent, statutory or constitutional—to enter upon such employment as he chooses. Qualification, or suitability, is a restriction upon any such right. For ex-

ample, maintenance of strict secrecy in respect to certain matters which come naturally to an employee's knowledge in the ordinary course of his employment is a commonplace element of suitability for particular employment. Trade secrets in industry,[27] financial matters in business, official affairs in Government,[28] are within the scope of this custom. Furthermore the Government frequently requires that one be particularly qualified, even for private employment: for example, to be a nurse, or a barber, or an engineer, or a lawyer. A young man, even one out of college, has no unrestricted right to practice law. He must (1) study for a prescribed period and (2) qualify under tests sponsored by the judicial branch of the Government. It is after one has been qualified and licensed, or admitted, to a trade or profession that rights under contract or statute attach and a debarment from that occupation requires certain procedural steps.[29] And the same doctrine applies where Government action is of such nature as to be a factual debarment of the individual from his vocation or profession, even though not a formal disbarment or cancellation of license. This is what the Supreme Court was talking about in Greene v. McElroy,[30] as the Court repeatedly emphasized in its opinion. The person there involved was an aeronautical engineer of such specialized training and capacity that access to classified information was essential to engagement in his profession. Denial of such access was a complete debarment.

*Removal Process.*

No employed person has an inherent or natural right (*i. e.,* a right apart from statute, regulation or contract) to any sort of process in respect to

**27.** See Blake, Employee Agreements Not To Compete, 73 Harv.L.Rev. 625, 667–674 (1960).

**28.** To take a simple example: a law clerk applicant may be a legal giant; he may have a most engaging personality; but, if he cannot be entrusted with judicial secrets, no judge would consider him suitable for appointment. The same principle obviously applies in all branches of the Government.

**29.** See Gellhorn & Byse, Administrative Law 768–779 (1954).

**30.** 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959).

removal from his particular job.[31] In private employment an employee's rights in respect to discharge stem from the contract of employment. This is and always has been established law; it is one of the basic reasons for trade unions. The rights of Government employees in respect to removal from employment stem from statute or from regulations adopted by the authority by which they were employed. This has been established law throughout the history of this country.[32] Originally, as every student of history knows, the Executive authority had plenary power to remove summarily any and all Executive employees; and they did so.[33] The climax of the long fight for security in the civil service was the enactment of the Lloyd-La Follette Act in 1912. That Act, as amended, is still in force. It specifically provides: "No examination of witnesses nor any trial or hearing shall be required except in the discretion of the officer or employee directing the removal or suspension without pay." [34]

■ That statute has been discussed under attack many times in the courts, but no court has ever intimated a shadow of unconstitutionality in it. The law is clear. Absent an express statutory protection, any Government office, the tenure of which is not fixed by the Constitution or set by statute, is subject to removal at pleasure. This one thread is the warp of the whole fabric of the case law; it appears throughout—from Ex parte Hennen in 1839 [35] to Vitarelli v. Seaton in 1959.[36] Except for special classes, Government employees may be removed summarily without charges and, except for the provisions of the Lloyd-La Follette Act, without reasons. A holding to the contrary would necessitate a ruling that the Lloyd-La Follette Act is and always has been invalid; that the hundreds of employees discharged under its procedural terms since 1912 were wrongfully discharged; and that Government employment at all levels carries life tenure, i. e., inherent, constitutionally protected invulnerability to discharge, except upon charges, open hearings, confrontation by witnesses, cross-examination, and findings. Such conclusions have no support in law, in our opinion.

*Situs.*

■ Finally, absent a special contract or circumstances constituting a total debarment from an occupation, an employee has virtually no rights in respect to the situs of his employment. Grocery chains, public utilities, law firms, and notably the Government, move employees about from place to place willy-nilly. It would be fantastic to propose seriously that an employee of a large employer has some sort of procedural rights which must be respected before he can be moved

---

31. 35 Am.Jur., Master and Servant §§ 26, 34 (1941) and cases there cited.

32. See, e. g., Ex parte Hennen, 13 Pet. 230, 259, 38 U.S. 230, 259 (1839); Shurtleff v. United States, 189 U.S. 311, 23 S.Ct. 535, 47 L.Ed. 828 (1903); Myers v. United States, 272 U.S. 52, 47 S.Ct. 21, 71 L.Ed. 160 (1926); Humphrey's Executor v. United States, 295 U.S. 602, 55 S. Ct. 869, 79 L.Ed. 1611 (1935).

33. The history texts are replete with examples. Fish, The Civil Service and the Patronage 13–14, 20, 26, 28, 39, 65, 120–121, 125, 130, 147, 153, 155, 160, 164, 166, 168, 170, 252 (1905); 4 Channing, History of the United States 256–257 (1935); 5 Channing, op. cit. supra at 389 (1933); 6 Channing, op. cit. supra at 302 (1930); Schubert, The Presidency in the Courts ch. 2 (1957); Hacker & Kendrick, The United States Since 1865, pp. 99–100 (1934); Hicks, The Federal Union 397 (1937); Hart, Tenure of Office Under the Constitution (1930); and see generally Sageser, The First Two Decades of the Pendleton Act: A Study of Civil Service Reform (Univ.Studies, U. of Neb., 1935); Foulke, Fighting the Spoilsmen (1919); Richardson, Problems in the Removal of Federal Civil Servants, 54 Mich.L.Rev. 219 (1955); Grundstein, Presidential Power, Administration and Administrative Law, 18 Geo.Wash. L.Rev. 285, 296 et seq. (1950).

34. 37 Stat. 555, as amended, 62 Stat. 355 (1948), 5 U.S.C.A. § 652(a).

35. 13 Pet. 230, 38 U.S. 230.

36. 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012.

from here to there. Certainly the Government's many moves in decentralization programs give no heed to any such notion.

The young lawyer in our analogy, supra, has no right to employment by any particular person or client, or indeed to any clients at all. And his place of employment, his continued engagement in any particular matter or by any particular client, are entirely at the whim of his employers. To take a simple example: If the Government were to retain as consultants a private law firm, and the firm sent one of its young lawyers to do some of the work; and if a Government officer called a senior member of the firm and said, "This young man is too gabby for our purposes. Don't send him over here any more"; the young lawyer would have no rights of procedural process of any kind, sort or description.

Again by way of analogy, certainly no one would doubt the authority of the Supreme Court to require its private printer to transfer a Linotype operator who, without wrongful intent, portrayed to his friends at afternoon stops in a convenient bar the nature of the opinions he was putting in print. No one would contend, we think, that the right of a Linotype operator to work on the advance printing of opinions of the Court is such that he could not be removed from the premises without a hearing in full panoply of charges, confrontation of witnesses, compulsory disclosures in public by his cronies, cross-examination, and findings. An investigation sufficient to satisfy the Court of the afternoon garrulity of the employee and a quiet word to the printer would be all such a situation would entail, we think. He could be put to work somewhere else.

■ We come back to the problem as to Brawner. She was not discharged. She was not debarred from her chosen occupation. She was offered a similar job by her same employer, and she refused. There are scores of places open to short-order cooks here and everywhere. The essence of her claim is that the site of her employment cannot be changed unless charges are made against her and she has a full hearing with witnesses, etc. We find no substance whatever to her claim.

*Stigma.*

■ It is further argued in Brawner's behalf that the Governmental action has besmirched her reputation. Of course it has consistently been held that outright dismissals from Government employ, on stated grounds of malfeasance, bribery, or even attempted seduction, are validly accomplished without the traditional trappings of due process.[37] And we see no comparatively greater defamation in a denial of entrance to a naval installation because of its security requirements. Nobody has said that Brawner is disloyal or is suspected of the slightest shadow of intentional wrongdoing. "Security requirements" at such an installation, like such requirements under many other circumstances, cover many matters other than loyalty. Certainly they must cover garrulity, honesty, a measure of judgment, sobriety, a high sense of one's obligations, etc. A naval installation such as a gun factory is in and of itself a confidential matter of highest priority, and many of its vital features are observable by anyone on the premises. Many physical characteristics of guns or machinery may be observable and transmittable by the most inexpert observer. The mere presence of certain officers may be important. The normal idle lunchtime chatter of employees in such operations may be saturated with comment which may well be inconsequential upon the premises but pregnant with danger outside it. Security regulations for such places are not to be restricted to control of access to copies of papers or limited to

---

37. Eberlein v. United States, 257 U.S. 82, 42 S.Ct. 12, 66 L.Ed. 140 (1918); Golding v. United States, 78 Ct.Cl. 682, certiorari denied, 292 U.S. 643, 54 S.Ct. 776, 78 L.Ed. 1494 (1934); Kent v. United States, 105 Ct.Cl. 280 (1946); Richardson, Problems in the Removal of Federal Civil Servants, 54 Mich.L.Rev. 219, 240 et seq. (1955).

the locking of a safe at night. Security regulations in such an installation may well include an impenetrable silence on Factory matters and events, no matter how trivial they may appear to a reviewing court. Denial of employment at a Navy installation because of its security requirements is certainly no more of a stigma than is a discharge for almost any reason. Almost any discharge is a "stigma". But such discharges are not protected by any inherent right to confrontation, cross-examination, etc. The rhetoric in these arguments is greater than their substance.

*Third-Party Interference.*

 We come now to another phase of Brawner's case. It is argued to us that in this case the Government (*i. e.*, the Governmental appellees) stands in the position of a third-party tort-feasor; that is, it was guilty of interfering with an employment contract.[38] That contract was Brawner's contract (via her representative, the Union) with her employer. In the first place we note this is not the typical case of third-party interference. Admittedly the Governmental action did constitute an "interference" with Brawner's continued employment at a particular situs. The precise question is whether this "interference" was illegal, that is, constituted an actionable wrong. As we have already seen, vis-a-vis his employer, no employee has an inherent right to work at a particular situs. Such a right may under some circumstances exist vis-a-vis a stranger to the employment relationship. But under the law of third-party-interference a defendant is not liable if the alleged interference is no more than the exercise of a legal right equal to or greater than the right claimed by the employee.[39] The Government had such a right, namely the right to exclude people from the Gun Factory. Through the Board of Governors of the Gun Factory Cafeterias, the Government recited this right in Section 5(b) of its contract with M & M Restaurants, Inc. This right was exercised by the Government, through the Governmental appellees, by enforcement of the contract. This right is clearly equal to, or greater than, whatever right Brawner could claim to work at the particular situs. Furthermore, not only did the Governmental appellees exercise a legal right; they performed the legal duty of exercising their discretion under the applicable regulations. We find no liability on the Governmental appellees as third-party tort-feasors.

### IV. Liability of M & M Restaurants, Inc.

 We next consider the liability of the concessionaire. It is argued to us that the agreement between M & M Res-

---

38. The cases stating the law pertinent to this tort are collected in Annotations, 29 A.L.R. 532 (1924); 84 A.L.R. 43 (1933), supplemented, 26 A.L.R.2d 1227 (1952); 9 A.L.R.2d 228 (1950). The law in this area developed from early recognition of a right of action for intentional interference with a man's business, Garret v. Taylor, Cro.Jac. 567, 79 Eng.Rep. 485 (1621), to include protection of one's right to a livelihood, e. g., Truax v. Raich, 239 U.S. 33, 36 S.Ct. 7, 60 L.Ed. 131 (1915) (involving an employment relationship terminable at will by the parties); Owen v. Williams, 322 Mass. 356, 77 N.E.2d 318, 9 A.L.R.2d 223 (1948). We must note that the United States as such cannot be liable in damages for "interference with contract rights" (including employment contracts) under the Federal Tort Claims Act, 28 U.S.C. § 2680(h) (1958). See Du-

pree v. United States, 264 F.2d 140 (3 Cir.), certiorari denied, 1959, 361 U.S. 823, 80 S.Ct. 69, 4 L.Ed.2d 67. In view of our disposition of the case, we need not reach the question whether the appellants are seeking to hold the United States, and not merely the Governmental appellees, liable for such damages.

39. See Spalding v. Vilas, 161 U.S. 483, 16 S.Ct. 631, 40 L.Ed. 780 (1896) (Postmaster General held not liable in damages even if he acted maliciously); Annotation, 29 A.L.R. 532, 533 (1924). In Donovan v. T. & P. Ry., 64 Tex. 519 (1885), an employee of a freight hauling company lost his position because the railway, by regulation, barred all but railway employees from access to its warehouse. The railway was found not liable, because it had a legal right to adopt such a regulation.

taurants, Inc., and the Union, the latter acting on behalf of all employees, contained a provision that employees should not be discharged without good and sufficient cause. To this there are two answers. In the first place, Brawner was not discharged. In the second place, if she had been discharged, surely, so far as her employer was concerned, the refusal of the commanding officer of the Factory to approve her entrance upon the Factory premises was a good and sufficient cause for the employer to release her from employment.

### V. Greene v. McElroy

Greene v. McElroy, supra, is cited to us as controlling. We think it does not treat of our problem. In the first place Greene dealt only with the "authorization" relied upon by the Government officers. The Court was quite explicit about this delimitation. We do not have that line of authorization in our case, and the authority dealing with entrance upon naval installations, which we have recited, is clear and ample. In the next place, as we have pointed out, Greene dealt with a total debarment, in fact even though not technically, from a chosen occupation. The testimony was, as recited in footnote 11 to the Court's opinion: "In view of his [Greene's] position with the company, there was no work which he could do in light of this denial of clearance by the Navy. As a result, it was necessary for the company to discharge him." We have no such case here. In the concurring opinion in Joint Anti-Fascist Refugee Committee v. McGrath,[40] which the Court cites in Greene, Mr. Justice Frankfurter emphasizes the historic background of the procedural requirements in different types of proceedings. The Justice said in part:

"The Court has responded to the infinite variety and perplexity of the tasks of government by recognizing that what is unfair in one situation may be fair in another. * * *

The precise nature of the interest that has been adversely affected, the manner in which this was done, the reasons for doing it, the available alternatives to the procedure that was followed, the protection implicit in the office of the functionary whose conduct is challenged, the balance of hurt complained of and good accomplished—these are some of the considerations that must enter into the judicial judgment.

＊　　＊　　＊　　＊　　＊　　＊

"* * * Finally, summary administrative procedure may be sanctioned by history or obvious necessity." [41]

We have discussed the historic background of our present problem, the precise nature of the interest affected, and the other factors mentioned in the quoted passage. Nothing in that study suggests a hearing, with witnesses, etc., in respect to employment at a particular place, where the circumstances do not spell total debarment from an occupation.

We hold only that under the circumstances of this case—including the statutes, the regulations, the nature of the place involved, the two contracts, and the arbitration proceeding—no rights of appellant Brawner were violated by the lifting of her identification badge for entrance to the Gun Factory. We have discussed other subjects only because they were pressed upon us by way of argument and must needs be discussed.

The judgment of the District Court is Affirmed.

DANAHER, Circuit Judge (concurring).

The dissenting opinion seems to condemn a majority of the court for the decision to rehear the case *en banc*. I am impelled to comment for I had dissented from Judge Edgerton's opinion now annexed to Judge Fahy's present text, as is my original dissent.

**40.** 341 U.S. 123, 71 S.Ct. 624, 95 L.Ed. 817 (1951).

**41.** Id., 341 U.S. at pages 163, 168, 71 S.Ct. at pages 643–646.

It has been fittingly observed that our power to rehear a case *en banc* should be exercised "sparingly," particularly at the instance of one of the parties.[1] "Moderation and self-restraint" control the exercise of our discretion in deciding such motions, but one criterion, at least, involves the effect of an erroneous opinion which may set a precedent for this Circuit.

Our dissenting brothers observe that after appeal in this case had been taken, none of the parties and no member of the division assigned to hear the case and no other member of the court requested that the case be heard *en banc*. Overlooked is the fact that a unanimous division of this court had decided our Greene v. McElroy on April 17, 1958,[2] where the situation and the circumstances went far beyond those presented in the instant case. There was no slightest reason for any member of the court or for counsel for the parties to assume what course ultimately might be followed in the Greene case.

The Supreme Court granted *certiorari* in Greene v. McElroy on October 27, 1958.[3] The instant case, before a division of the court differently constituted from that which had heard the Greene case, was argued February 19, 1959. The sitting division decided to await the action of the Supreme Court. Neither counsel nor any other member of the court then knew that we had done so, nor could any of us know that the Supreme Court on June 29, 1959 would hand down its decision reversing Greene v. McElroy.[4]

Not until August 21, 1959 during summer recess, with most of the judges away, could it publicly be known that a majority of the sitting division had concluded that the instant case was deemed to be controlled by the Supreme Court's decision in Greene v. McElroy. When Government counsel saw the opinion of the majority, a motion for rehearing *en banc* was promptly filed.

After our judges had returned for the Fall sessions of the court and had had an opportunity to read the majority opinion with the opposing dissent, and to consider the Government's pending motion, the case was ordered on for argument before the full court on November 9, 1959.

What did the record disclose? A private corporation had had a contract with the United States Government to operate a cafeteria in the Naval Gun Factory, owned by the United States. The contractor, M & M Restaurants, Inc., had as one of its employees, Rachel Brawner. As a cook, like other private, non-Government personnel, she was privileged to enter upon the premises of the United States Government only while in possession of a badge of identification, required by naval regulations.

The Board of Governors at the Naval Gun Factory had been notified by the Navy's security officer that Rachel Brawner "would have to surrender her Naval Gun Factory badge and would not be permitted to enter the Naval Gun Factory *until clearance is certified by the Security Officer*." (Emphasis added.) Mr. Baker, representing M & M, was requested to return Mrs. Brawner's badge, and

1. It may prove of interest to observe that there have been 72 such motions in the current court year and only 2 have been granted. Our Clerk's records show as to motions for rehearing *en banc* filed by one of the parties: in the court year 1958–1959, 97 such motions were filed and we granted but 1; in the preceding court year, 84 such motions were filed and we granted but 2; in the court year 1956–1957, 48 such motions were filed but we granted none; in 1955–1956, 32 such motions were filed and we granted but 3; in 1954–1955, 35 such motions were filed and we granted none, while in the preceding year we granted but 1 of 21 motions. Thus, of 389 such motions in the last seven court years, only 9 have been granted.

2. 103 U.S.App.D.C. 87, 254 F.2d 944.

3. 358 U.S. 872, 79 S.Ct. 110, 3 L.Ed.2d 103.

4. 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377. Argument was had on April 1, 1959.

he did so. Mr. Baker informed Mrs. Brawner that he had picked up her badge "for security reasons." [5]

The appellant union instituted arbitration proceedings, extensively conducted thereafter. It was then brought out that the union represents 2,000 members who are privately employed by restaurants in Government buildings and 600 members who are commercially employed in cafeterias and restaurants in this area. One of the arbitrators, Samuel H. Jaffe, Esquire, of the firm of Jaffe and Dunau, dissented from the arbitration award. He argued in his dissent against the determination by those in command that Mrs. Brawner did not meet "basic requirements and thus her pass was revoked." He pointed out that there is "no *greater threat to the very existence of a labor organization,* than to permit an employer the unilateral action it has indulged here." (Emphasis added.) He further assailed the action of the security officer as "in execss of his authority or under authority not validly conferred. For otherwise no government employee could ever have successfully challenged his ouster from public employment on security grounds: the government could simply answer his protest by saying that the government cannot be required to permit him to work in a building it owns and from which his entry could be barred."

As will be seen from the majority opinion of the sitting division, Judge Edgerton adopted the position urged by Mr. Jaffe. He found the naval officer's order invalid in terms of Greene v. McElroy as lacking safeguards of confrontation and cross-examination, and "if," he said, "if" Navy regulations purported to justify the order, the regulations "as in the Greene case" were likewise similarly deficient. He adopted the analogy offered by Mr. Jaffe that the Government might "deprive government employees of their jobs on similar grounds, without giving them a hearing, by simply excluding them from the places where they work." Of course, we were not dealing here with a Government employee. Again, even Government employees in *unprotected* status may be dismissed out of hand. They have protected employment rights only if and when Congress confers such rights.

Thus, as our judges examined the record, it became apparent that there is much more to the problem than at first seems to meet the eye.

Mrs. Brawner's employer, M & M, offered her other employment at a different installation operated by it. She refused. That there are scores of privately operated concessions in Government buildings is common knowledge. It is reasonable to assume that private employment as a cook may be available in hundreds upon hundreds of restaurants and cafeterias in the Washington area. This is not a case of "barricading" Mrs. Brawner against employment, as the Supreme Court found had happened to Greene. But it *is* a case of the union insisting that it may place and keep one of its members in a *private* employment status in a *particular* job, in a *particular* place on *Government* property even when Government authorities direct that access be denied "until clearance is certified by the Security Officer."

Never to my knowledge had there been such a challenge to the Government's right to protect its own Navy installation. Throughout our history, the authority of a Navy commandant had not been questioned as he exercised controls over those seeking or claiming the privilege of access to Government property in his charge. I dissented from the majority views. For one thing, I thought the Commandant independently possessed the power he asserted. Again, to the extent that a majority of the sitting

5. Mr. Baker's interpretation may not seem accurate. The notice indicated that Mrs. Brawner had become subject to further check. "Security" could mean many things. Mrs. Brawner might even have been personally insanitary in her food handling and had so become a risk. We have not been told just what prompted the further check on Mrs. Brawner.

division found that the Navy regulations, if relied upon, might have been invalid, I particularly sought to "dissociate myself from the suggestion that invalidity implicitly turns upon whether, in application, provision has been made for 'confrontation and cross-examination' of sources whose reports may have led to revocation of the privilege of access to the Government's enclave."

 I believe a privately employed worker hired by a Government contractor may enter upon Government property only as a matter of privilege which may be accorded or withdrawn as those lawfully charged with responsibility for maintenance of the property may prescribe. I believe no hearing need necessarily be required. To illustrate, I believe confrontation by accusers and a right of cross-examination are not essentials to a valid revocation of "passes" permitting lawyers to use the Supreme Court library, or passes to visitors to the White House, or to employees of public utilities and other contractors servicing Government buildings. It might seem that any of many indiscretions or, specifically a food-handler's personal habits, could prompt such revocation. Even though a privately employed person has no *authorized* access to a file room in a highly sensitive naval gun factory, if such a person without authorization should be observed in that file room, I think the security officer may order a suspension of the privilege of access pending clearance. I think that officer lawfully might demand that the employer transfer or otherwise deal with the employee without granting confrontation by accusers or a right to cross-examination of them. Even if it were a Government employee in an unprotected status no hearing of any kind whatever would be required.[6]

Since the Government had had no opportunity to present its arguments in the light of Judge Edgerton's application of Greene v. McElroy, a majority of the whole court decided to hear this case *en banc*. We have no means of knowing whether the Supreme Court will take a case or not. We do know that, unless reversed, a majority opinion here establishes a precedent for this Circuit. If the views of the two judges were to bind the other seven judges comprising this court here at the seat of government, we would indeed be laying down a new rule of law to control the Government's administration of its property.[7]

So we voted to rehear the case *en banc* and to consider the Government's arguments. Some of the factors distinguishing this case from Greene may be summarized:

Here, unlike Greene, there was no showing that the cook could not get another position. On the contrary, her own employer offered her another job which she declined.

Here, unlike Greene, it was the Government's own weapons producing property which was involved.

Here, unlike Greene where neither Congress nor Executive Order had authorized the particular procedure applied in Greene, we have the Constitution and the statutes expressly providing for control of military and naval establishments by officers selected for that responsibility. Indeed, Congress has made it a criminal offense for an unauthorized person to trespass upon the property.

Here, unlike Greene where an Industrial Security Clearance Program was challenged, we find a mere suspension of privilege of access "until clearance is certified"—and no regulation purported to authorize or to provide a right to a hearing.

---

6. See Vitarelli v. Seaton, 1959, 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012; Bailey v. Richardson, 1950, 86 U.S.App.D.C. 248, 182 F.2d 46, affirmed 1951, 341 U.S. 918, 71 S.Ct. 669, 95 L.Ed. 1352.

7. We, *ourselves*, refused to permit members of a bar association to conduct evening moot court sessions in this court house, essentially on grounds of building security. If the privilege had in fact been granted, would we have been precluded from revoking it without a hearing? and charges? and accusers? and confrontation and cross examination?

Here, unlike Greene where a specially trained aeronautical engineer was typical of thousands who would potentially be deprived of private employment and "barricaded" against other work, we must balance the Government's concern in its own protection in terms of excluding possibly undesirable employees of private contractors who may be employable elsewhere.

Finally, a majority of our judges may well have concluded that a majority of the sitting division had read into Greene what the Supreme Court said it had read out of it. Rehearing en banc was ordered because we believed Judge Edgerton's opinion *might* be erroneous. We all heard and considered the case and now decide that it was erroneous. Judge Fahy would have us reinstate an opinion which most of us believe to be erroneous. I am unable to subscribe to the view that to perpetuate error makes for sound judicial administration.

As I see it, the Supreme Court, the Judicial Conference of the United States

and Congress support the position taken by a majority of the court. I think there is great "call for this court en banc to overrule the [erroneous] decision of the division" which first heard the case. I quite understand that there had been differing approaches in a circumstance such as this, but I think the problem has been solved, not only by 28 U.S.C. § 46(c) but by the Western Pacific Railroad case, Western Pac. R. Corp. v. Western Pac. R. Co.[8]

Before the Western Pacific Railroad case was decided, the late Chief Judge Stephens delivered a paper before the District Bar Association, pointing to our practice of furnishing the draft opinion of a sitting division to the other members of the court. He listed cases[9] where the court had sat en banc after Congress had adopted 28 U.S.C. § 46(c), tracing recognition of its power to do so back to Textile Securities Mills Corp. v. Com'r, supra note 8.[10]

In the Conference of Senior Circuit Judges meeting on October 1, 1938, with

8. 1953, 345 U.S. 247, 73 S.Ct. 656, 97 L. Ed. 986; views suggesting those held by Judge Fahy may be noted at page 265 of 345 U.S., at page 665 of 73 S.Ct. The Supreme Court already had stated otherwise in Textile Securities Mills Corp. v. Com'r, 1941, 314 U.S. 326, 62 S.Ct. 272, 86 L.Ed. 249. At page 335, of 314 U.S., at page 278 of 62 S.Ct. Mr. Justice Douglas wrote:

"Conflicts within a circuit will be avoided. Finality of decision in the circuit courts of appeal will be promoted. Those considerations are especially important in view of the fact that in our federal judicial system these courts are the courts of last resort in the run of ordinary cases. Such considerations are, of course, not for us to weigh in case Congress has devised a system where the judges of a court are prohibited from sitting en banc. But where, as here, the case on the statute is not foreclosed, they aid in tipping the scales in favor of the more practicable interpretation."

And see Civil Aeronautics Board v. Am. Air Transp., 1952, 344 U.S. 4, 5, 73 S. Ct. 2, 3, 97 L.Ed. 4 where the Court told this circuit it "may now wish to hear this case en banc to resolve the deadlock indicated in the certificate and give full review to the entire case."

9. 20 Journal D.C. B.A. 103, 107, 108 (1953); at that time, 1953–1954, the Chief Judge made up the sitting divisions, assigning judges whose recognized differing viewpoints might be balanced in the consideration of each case. But since this court thereafter inaugurated the plan of choosing judges by lot, combinations of two particular judges holding similar "policy" views may occur with greater or less frequency, depending upon the dates they select for their assignments. Situations have arisen where a majority of the court has found itself at odds with particular opinions in cases as to which sua sponte, the full court has sometimes ordered rehearings en banc. See footnote 10.

10. The following tabulation, relevant to footnote 9, discloses that the court has sua sponte ordered rehearings en banc as follows:

| | Motions | Granted |
|---|---|---|
| 1953–1954 | 1 | 1 |
| 1954–1955 | 9 | 5 |
| 1955–1956 | 4 | 4 |
| 1956–1957 | 8 | 8 |
| 1957–1958 | 13 | 8 |
| 1958–1959 | 4 | 4 |
| 1959–1960 | 7 | 1 |

Chief Justice Hughes presiding, Judge Stone of the Eighth Circuit brought up the question "of determining how many judges will sit in a given case." The Chief Justice asked: " * * * would it meet your point if the statute provided that the court shall consist of three judges unless in the opinion of the majority of circuit judges a larger court or a court of a greater number of judges at any time shall be deemed desirable?" [11] Following discussion, Judge Wilbur moved and the Conference adopted in substance, the proposal that Congress be asked to legislate that a majority of the circuit judges might provide for a court of more than three judges when in their opinion unusual circumstances make such action advisable. The Conference so recommended, in 1938 and each successive year, until in 1941, the House adopted H.R. 3390. Its report No. 1246 [12] drew upon a letter from Judge Biggs dated February 14, 1941, reporting the recommendation of the Judicial Conference that Congress act favorably on the measure. Judge Biggs noted that the Conference deemed it advisable that all the active and available judges of the circuit should be included "to avoid any ground for suspicion that particular judges of the court, more than three but less than all, were selected to bring about a particular decision." [13] He added: "It was to avoid the determination of decisions by a minority of judges, although in the utmost good faith, that did not represent the judgment of the court as a whole, that the measure was recommended by the Judicial Conference * * *."

The Senate in 1941 had before it S. 1053, the counterpart of the House measure. The Judicial Conference in special session in January, 1941, had recommended its passage. Administrator Chandler at the April hearings presented the favorable views of the Judicial Conference, quoting, in part, from a letter reflecting the Conference position:

"Many cases are of a highly controversial nature and permit, not unreasonably, diverse views of the law. We think that if there be a controversial case a majority of the court should not be bound by a decision of two members, particularly if the other members of the court are plainly of the opinion that the question is of such importance that they desire to have their say in regard to what they think the law is." [14]

Such was the background as reported *by the senior circuit judges themselves* for the ultimate adoption of 28 U.S.C. § 46(c). Congress cautiously examined the problem for many years in the light of Judicial Conference recommendations and Supreme Court pronouncements before codifying section 46(c).[15]

11. Minutes of the Conference, p. 360.

12. See footnote 14, Textile Securities Mills Corp. v. Com'r, 314 U.S. at pages 334–335, 62 S.Ct. 272, 278, 86 L.Ed. 249. The committee report deemed *en banc* consideration desirable. "It also will obviate the situation where there are seven members of the court and as sometimes happens a decision of two judges (there having been a dissent) sets the precedent for the remaining judges."

13. Letter on file, Administrative Office of United States Courts. Congress by the Act of August 3, 1949, 63 Stat. 493, 28 U.S.C. § 44, added three judges to this court. Three of our Circuit Judges received recess appointments on October 21, 1949.

14. Hearings Before the Subcommittee of the Senate Committee on the Judiciary, 77th Cong., 1st Sess., re S. 1053, pp. 15–16 (1941). Additional legislative history may be found in Western Pacific Railroad case, supra note 8, particularly at page 254 of 345 U.S., at page 659 of 73 S. Ct. and footnotes 8 et seq.; and see En Banc Proceedings in the United States Courts of Appeals, 22 Geo.Wash.L.Rev. 482 (1954).

15. Western Pacific Railroad case, supra note 8, at page 253, 254, of 345 U.S. at page 659 of 73 S.Ct.; and see Hearing and Rehearing Cases In Banc, D.C., 14 F.R.D. 91, 96–97 where Judge Maris wrote:
"A decision of a controversial question made by a majority of all the judges of the court in banc obviously has much

Of course we may—and most often do —decide not to resort to section 46(c). We may even refuse to do so altogether. We may then attempt to certify unresolved questions to the Supreme Court, but we may find them dismissed.[16] We may let successive divisions develop a conflict within the circuit. Is that result to be desired? I reject any such course, and believe we should earnestly attempt to decide and thus to settle our own differences—by majority action of the whole court. And that is precisely what the Supreme Court has told us to do.

> "[A]ll but two Circuits have more than three Circuit Judges. This undoubtedly raises problems when one panel has doubts about a previous decision by another panel of the same court. * * * It is primarily the task of a Court of Appeals to reconcile its internal difficulties."[17]

Rehearings *en banc* pursuant to section 46(c) in most cases have achieved definitive disposition of controversial and decisive differences. I do not regard as wasted the time so spent, particularly when we look back upon the multiple conferences and the often futile exchanges of memoranda as we *otherwise* have sought agreement. Reconciliation of deeply held views has sometimes presented an imponderable problem in courts other than ours. A determination here by *en banc* rehearing and decision seems to me a highly salutory course. In that spirit we approached this very case.

The dissenters here would "reinstate" the opinion of the sitting division. A majority of the whole court, all nine judges voting, deem it erroneous. We thus assert and exert the authority conferred by 28 U.S.C. § 46(c) precisely in furtherance of one of the important purposes of the legislation as recommended by the Judicial Conference and as recognized by Congress.[18] We have acted under "a grant of power to order hearings and rehearings *en banc* and to establish the procedure governing the exercise of that power,"[19] as the Supreme Court recognized.

In that view condemnation of the present majority by two of our colleagues may seem inapropos. I concur in the opinion by Chief Judge Prettyman.

I am authorized to state that Chief Judge Prettyman and Circuit Judges

---

greater authority than a decision by two concurring judges of a panel of three which all the other five judges of the court might consider quite erroneous. True such matters could be corrected by the Supreme Court on certiorari but that court should not have to resolve conflicts of decision within a single court. The procedure in banc enables the court itself to deal authoritatively with problems of this nature, thus relieving the burden of the Supreme Court. The Circuit Judges of the Third Circuit think that this procedure has been very helpful in maintaining the very high esprit de corps which they enjoy. For each of them knows that in any case in which they are seriously divided in opinion they will all have an opportunity to participate in the ultimate decision which the court is to make and which under the doctrine of stare decisis is to be binding upon them in future cases."

16. See, e. g., In re Burwell, 1956, 350 U.S. 521, at page 522, 76 S.Ct. 539, at page 540, 100 L.Ed. 666, where the Court hinted at its Western Pacific case, as pointing a route to decision; and Civil Aeronautics Board v. Am. Air Transp., supra note 8.

17. Wisniewski v. United States, 1957, 353 U.S. 901–902, 77 S.Ct. 633, 634, 1 L.Ed. 2d 658, and cases cited. And see, e.g., Starr v. United States, 1958, 105 U.S. App.D.C. 91, 264 F.2d 377, certiorari denied, 1959, 359 U.S. 936, 79 S.Ct. 652, 3 L.Ed.2d 639; Brown v. United States, 105 U.S.App.D.C. 77, 264 F.2d 363, certiorari denied, 1959, 360 U.S. 911, 79 S. Ct. 1299, 3 L.Ed.2d 1262.

18. It is reasonable to suppose the Supreme Court will agree. It has told us "Our [its] general power to supervise the administration of justice in the federal courts * * * does not extend to disregarding a validly enacted and applicable statute or permitting departure from it * * *." United States v. Nat. City Lines, 1948, 334 U.S. 573, 589, 68 S.Ct. 1169, 1178, 92 L.Ed. 1584.

19. Western Pacific Railroad case, supra note 8, 345 U.S. at page 267, 73 S.Ct. 656, at page 666.

Wilbur K. Miller, Bastian and Burger concur in my opinion.

FAHY, Circuit Judge, with whom EDGERTON, Circuit Judge, joins (dissenting).

In my opinion, while according due respect to those of a contrary view, rehearing this case en banc, a matter for the exercise of the sound discretion of the full membership of the court, should not have been granted after the decision of the division. The statutory structure of this court of nine members, any three of whom constitute a court, is designed to enable us to keep abreast of our work as it increases in volume over the years. Though I do not question our power to rehear any case en banc it is a power to be exercised sparingly and only for good cause.[1]

Appellant Rachel M. Brawner, the private individual concerned, and the appellant labor organization of which she was a member, brought an action in the District Court on September 6, 1957, claiming that she had been illegally deprived by the Government, on security grounds, of her private employment as a cook in a cafeteria which was located with Government approval in the Naval Gun Factory. The District Court decided against her on July 21, 1958. She and the Union appealed to this court on August 14, 1958. Neither the appellants, nor the United States, nor any member of the division of this court assigned to hear the case, nor any other member of this court, requested that the case be heard en banc. The division accordingly heard argument, and took the case under advisement in February 1959. There was then pending in the Supreme Court Greene v. McElroy, 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377. That case also involved the discharge, demanded by the Government on security grounds, of a person in private employment. Mr. Greene was an employee of a company manufacturing products for the Defense Department. He was authorized to have access to classified information, which our appellant was not. The division which heard the present appeal awaited the decision of the Supreme Court in Greene v. McElroy, which came down June 29, 1959. Reversing this court, the Supreme Court held that Mr. Greene's deprivation of employment was unauthorized.

Neither the United States, nor appellants, nor any of the nine members of this court, then sought reargument of appellants' case, en banc or otherwise. On August 21, 1959, the division which had heard this case decided it, holding, especially in light of Greene v. McElroy, that appellant Brawner's discharge had not been validly accomplished, one judge dissenting. Five weeks later, on September 25, 1959, rehearing en banc was sought for the first time, by the United States, in order to obtain a reversal of our decision, thus using the full court of nine judges as a court of appeals over a division.

When the division decided the case it became ripe for consideration by the Supreme Court. When the United States nevertheless requested a rehearing en banc, each of the nine members of this court was called upon to consider the appropriate course for the litigation to take. Five members voted at this late stage to rehear the case en banc. It was accordingly set down for reargument, and reargued. It has now been re-decided, the earlier two to one decision of the division being reversed by a vote of five to four. Many months and much judicial and professional labor have been consumed in the en banc process, with final termination of the litigation still uncertain and probably far removed. A decision is rendered which four of us think clearly inconsistent with principles laid down by the Supreme Court in recently reversing this court in Greene v. McElroy. Appellant Brawner—unless she has wearied of the matter—will no doubt

---

1. The late Chief Judge Stephens stated his views upon the subject some years ago for the information of the Bar 20 D.C. Bar Ass'n Jour. 105-09 (1953).

seek Supreme Court review. In that event the Supreme Court will be faced, as it could quite as well have been faced many months ago when the decision of the division was rendered, with the question whether or not to review the case. There was no call for this court en banc to review the decision of the division because, by reason of the nature of our court and of this case, the responsibility of decision at the level of this court had been fully met. It seems to me that in such a case as this the possibility of a different result should then have been left, as it is now much later left, to the Supreme Court. Even if the decision of the division be doubtful nothing has been advanced, and everything has been retarded, for both the individual and the Government, by the substitution nearly eight months later of a decision no less doubtful.

Were the case of only local importance, and therefore one in which a decision deemed by a majority of the full court to be erroneous must be corrected if at all by the court en banc, because not worthy of presentation to the Supreme Court, then our court en banc might perhaps have been more warranted in intervening. Larkin v. United States, 108 U.S. App.D.C. 239, 281 F.2d 72, is illustrative. But even in such a case moderation and self-restraint would be in order, for the philosophy underlying the structure of this appellate court does not contemplate ordinarily a superior appellate court within the court itself. Moreover, had request for en banc hearing of this case been made before the division heard it, or even before the division decided it, such a hearing might reasonably have been granted because of the obvious importance of the case. But en banc intervention after the decision of the division has served merely to retard ultimate disposition of the litigation, with no countervailing advantage to either the public or the private interests involved.

My views thus expressed are not in condemnation of my brethren of the majority, but only an expression of opinion, different from theirs, as to the use of the en banc power.

I would vacate the order granting the rehearing en banc and would reinstate the opinion and judgment of this court first filed.

I add that deprivation of employment on security grounds is a grave injury. The public draws no sharp distinction between security and loyalty. Cf. Vitarelli v. Seaton, 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012. As the Supreme Court has said of exclusion from public employment on disloyalty grounds, "In the view of the community, the stain is a deep one; indeed, it has become a badge of infamy." Wieman v. Updegraff, 344 U.S. 183, 191, 73 S.Ct. 215, 218, 97 L.Ed. 216. Engineer and cook alike suffer, in spirit and in reputation. They should have equal protection.

The opinion of this court first filed, and the dissenting opinion filed at the same time, were as follows:

Before EDGERTON, FAHY, and DANAHER, Circuit Judges.

EDGERTON, Circuit Judge.

A private corporation, M & M Restaurants, Inc., under a contract with government officers, operated a cafeteria in the Naval Gun Factory, property of the United States. The corporation employed appellant Brawner, a civilian, as a cook. Without a hearing of any sort, the Superintendent and the Security Officer of the Naval Gun Factory excluded her from the premises and thereby deprived her of her job. They said she did not meet the "security requirements". No one told either her or the corporation which employed her what the security requirements were, or why she was believed not to meet them. The employer asked for "a hearing relative to the denial of admittance to the Naval Gun Factory of Rachel Brawner." The request was refused.

Brawner and her labor union sued the Secretary of Defense, the Secretary of the Navy, the Superintendent and the Security Officer of the Gun Factory, and also Brawner's employer, for the loss of her job, and have appealed from a summary judgment dismissing the complaint.

Except with respect to the employer, the District Court erred. This has now become clear. On June 29, 1959, the Supreme Court determined that the Secretary of Defense and his subordinates have not been empowered to deny a contractor's employee access to his work, and thereby deprive him of his job, on security grounds, "in a proceeding in which he was not afforded the safeguards of confrontation and cross-examination." Greene v. McElroy, 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377. What government officers are not empowered to do in such a proceeding, which includes a limited sort of hearing, they are not empowered to do in a proceeding that includes no hearing at all. As in the Greene case, if the action of the government officers was in accordance with Navy regulations, the regulations were unauthorized and invalid.

It is immaterial that Greene's working place does not appear to have been, as Brawner's was, on government property. From the premise that "the United States could validly exclude all persons from access to the Naval Gun Factory", appellees draw the conclusion that the Secretary of Defense could validly exclude Brawner from her work there, on "security" grounds, without giving her a hearing. If the conclusion followed from the premise, it would likewise follow that the Secretary could deprive government employees of their jobs on similar grounds, without giving them a hearing, by simply excluding them from the places where they work. But neither Congress nor the President has authorized any such thing. And it is clear that government officials may not deprive government employees of their jobs on security grounds except as authorized by Congress or the President. Peters v. Hobby, 349 U.S. 331, 75 S.Ct. 790, 99 L.Ed. 1129; Cole v. Young, 351 U.S. 536, 76 S.Ct. 861, 100 L.Ed. 1396.

The government challenges the standing of appellant labor union to sue. We think the union here had standing to protect the interests of its members.[1] Cf. Nat'l Ass'n for the Advancement of Colored People v. Alabama, 357 U.S. 449, 459–460, 78 S.Ct. 1163, 1170, 2 L.Ed.2d 1488; MacArthur Liquors, Inc. v. Palisades Citizens Ass'n, 105 U.S.App.D.C. 180, 265 F.2d 372.

Since Brawner's employer could not employ her within the Naval Gun Factory, the only place where it had contracted to employ her, when the government appellees would not let her enter the place, it is not responsible for ceasing to employ her. Appellants' claim against the employer is for alleged breach of contract, and impossibility of performance defeats the claim. The judgment in favor of M & M Restaurants, Inc., is therefore affirmed. The judgment in favor of the government appellees is

[1]. The union was the recognized representative of the employees of M & M Restaurants, Inc., under a collective bargaining agreement between the union and the Restaurants. The agreement authorized the union to participate in any dispute arising thereunder, including a dispute over discharge of any employee. When Implant Foods, Inc., replaced the Restaurants as the operator of the cafeteria, the new collective bargaining contract included a provision whereby Implant agreed to reinstate appellant with full rights should this suit be determined in her favor. Cf. Fishgold v. Sullivan Drydock & Repair Corp., 328 U.S. 275, 283, 66 S.Ct. 1105, 1110, 90 L.Ed. 1230.

reversed and the case is remanded to the District Court for proceedings consistent herewith.

So ordered.

DANAHER, Circuit Judge.

I concur specifically in the majority's opinion affirming the judgment in favor of M & M Restaurants, Inc. Otherwise I dissent.

To say that some officials may have abused their authority is not to deny that authority exists. This is not such a situation as was presented in Greene v. McElroy, 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377. The property here is owned by the Government and is part of the naval establishment. Control of access to the Naval Gun Factory has legally been vested in the Superintendent. When the public may enter and for what purposes and under what circumstances may be determined by that officer, in accordance with governing regulations. Congress has even made it a criminal offense, under some circumstances, for unauthorized personnel to be upon the premises. 18 U.S.C. § 1382 (1952).

The basic principle of control by the Government of its own naval establishment is here paramount, I think. Truck drivers, plumbers, telephone operators, electricians, artisans in every walk of life, in one way or other and at one time or other may have legitimate business with a naval base, but the privilege of access is to be extended and may be continued only as those charged with maintaining the security of the Government's operation may by regulation prescribe. If some petty thief or numbers player or narcotics peddler or otherwise unfit person should insist upon continuance of a previously extended privilege of access, I think the regulations authorize the Superintendent to bar him.

I am unable to conclude that regulations under which the officials here acted were invalid or unauthorized.

Particularly do I dissociate myself from the suggestion that invalidity implicitly turns upon whether, in application, provision has been made for "confrontation and cross-examination" of sources whose reports may have led to revocation of the privilege of access to the Government's enclave.

BAZELON and WASHINGTON, Circuit Judges (dissenting).

We agree with Judges EDGERTON and FAHY that the case must be reversed on the authority of Greene v. McElroy. We note also that we joined them in voting against rehearing en banc.