**BECHTEL CONSTRUCTORS CORPORATION, and the Detroit Edison Company, Plaintiffs-Counter-Defendants,**

v.

**DETROIT CARPENTERS DISTRICT COUNCIL and Local 1301, United Brotherhood of Carpenters and Joiners of America, Defendants-Counter-Plaintiffs.**

Civ. A. No. 84CV–7324–AA.

United States District Court,
E.D. Michigan, S.D.

June 14, 1985.

Fred W. Batten, Clark, Klein & Beaumont, George H. Kruszewski, Sachs, Nunn, Kates, Kadushin, O'Hare, Helveston & Waldman, Detroit, Mich., for plaintiffs-counter-defendants.

Stanley H. Slazinski, Detroit, Mich., for defendants-counter-plaintiffs.

## MEMORANDUM OPINION AND ORDER

JOINER, District Judge.

This action concerns the enforceability of an arbitration award. Bechtel Constructors Corporation ("Bechtel") is a contractor at Detroit Edison's Fermi 2 Nuclear Power Plant in Monroe, Michigan. Bechtel hired David and Howard Huffman to perform carpentry work at the Plant through the hiring hall of the defendant union, Local 1301 of the United Brotherhood of Carpenters and Joiners (the "union"). This dispute began when Bechtel fired the Huffmans for possessing and/or using marijuana on the job. The union grieved the terminations on behalf of the Huffmans pursuant to its collective bargaining agreement with Bechtel. The matter proceeded to arbitration. On June 26, 1984, Arbitrator Robert Howlett basically found in favor of the union. Bechtel now asks this court to vacate the arbitration award, and the union asks for its enforcement. Detroit Edison then intervened as a plaintiff to protect its asserted right as owner of the Plant to exclude the Huffmans. All three parties to this action, Bechtel, Detroit Edison, and the union, now move for summary judgment. The union also moves for an award of attorney's fees.

## I. *Facts Surrounding the Termination*

On October 25, 1982, the Huffmans were working the afternoon shift at the Plant. A laborer named Eddie Evans, who is not a party to this suit, was also on duty. The "lunch" break of the three men extended from 8:00 p.m. to 8:30 p.m. They walked outside the gate of the Fermi 2 project to eat at some picnic tables in a fabrication shop. Officer Stull, a Detroit Edison nuclear security officer, observed their movements. A little while later, Officer Stull went to the fabrication shop and peered through a hole in the wall. Stull testified that he could see Evans' face, but the backs of the two Huffmans were toward him. He first observed that David Huffman's hand was raised to the right of his mouth, and that smoke was rising from his head. David then passed something to Evans, who reached down toward David's hand to take it. Stull then identified the object, as Evans raised it to his mouth, as being a hand-rolled cigarette which he suspected contained marijuana. Evans then removed the "cigarette" and handed it toward Howard Huffman. Stull left his peephole and went to a door of the shop. As he entered, Stull noticed that Howard had the object in his left hand. Howard then dropped the "cigarette" on the ground and stamped on it with his foot. David grabbed a Marlboro pack that was on the table, crumpled it, and threw it on the ground behind him. A search of Evans revealed one marijuana cigarette, but nothing was found on either Huffman. It was later determined that the crushed butt contained marijuana, and the Marlboro pack contained marijuana residue.

Evans and the Huffmans deny that they were smoking marijuana. They claim the Evans lit a cigarette, and that David then pulled a cigarette from his pocket and asked Evans for a light. Evans handed David his cigarette, David lit his own cigarette from Evans' cigarette, and then David returned Evans' cigarette. At that moment, Stull burst through the door. The men claim that the crushed joint was al-

ready on the ground when they entered the shop.

The testimony described above was presented to Arbitrator Howlett. Bechtel and the union asked Arbitrator Howlett to decide if the discharges of David and Howard Huffman were for proper or just cause. If the arbitrator concluded that the discharges were improper, he was then to determine an appropriate remedy for the Huffmans.

## II. *The Arbitrator's Decision*

Justice Douglas set forth the standards governing federal court review of arbitrators' decisions in *United Steelworkers v. Enterprise Wheel and Car Corp.*, 363 U.S. 593, 596–97, 80 S.Ct. 1358, 1360–61, 4 L.Ed.2d 1424 (1960). The opinion emphasized that:

> the question of interpretation of the collective bargaining agreement is a question for the arbitrator. It is the arbitrator's construction which was bargained for; and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his.

363 U.S. at 599, 80 S.Ct. at 1362. The Court also stated that:

> Nevertheless, an arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice. He may of course look for guidance from many sources, yet his award is legitimate only so long as it draws its essence from the collective bargaining agreement. When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement.

363 U.S. at 597, 80 S.Ct. at 1361.

 The Sixth Circuit has made it clear that an arbitrator is bound by contract provisions that limit him to interpreting the terms of the collective bargaining agreement, and forbid the arbitrator from adding to, subtracting from, or modifying the terms of the contract. This means that an arbitrator that finds that an employee has committed an offense described in the contract must apply the penalty that the contract prescribes for the offense. The arbitrator lacks authority to impose a lesser penalty, and a court must refuse enforcement of such decisions. *See, e.g., Morgan Serv. Inc. v. Local 323, Chicago and Cent. States Joiner Bd., Amalgamated Clothing and Textile Workers Union*, 724 F.2d 1217 (6th Cir.1984) (when contract gives employer the right to discharge an employee for insubordination, and the arbitrator finds the employee insubordinate, then the arbitrator may not review the employer's decision to discharge the employee); *International Brotherhood of Firemen and Oilers, Local No. 935–B*, 630 F.2d 474, 476 (6th Cir.1980) ("It is not for the arbitrator to decide that discharge is too severe a penalty for the insubordination which he found because the penalty, namely, discharge is contractual."). The arbitrator may formulate a reasonable penalty for the offense that he finds, however, when the collective bargaining agreement specifically gives this authority to the arbitrator. *See, e.g., Falls Stamping & Welding Co. v. International Union, United Auto, Aircraft & Agricultural Implement Workers, Local Union 1194*, 575 F.2d 1191 (6th Cir. 1978), *cert. denied*, 455 U.S. 1019, 102 S.Ct. 1715, 72 L.Ed.2d 136 (1982) (arbitrator may reinstate an employee when the contract provided that all discipline or discharge would be subject to the grievance procedure, which included arbitration); *Timken Co. v. United Steelworkers*, 492 F.2d 1178 (6th Cir.1974) (arbitrator may reinstate an employee when the contract provided the arbitrator with authority to interpret or apply the agreement and disciplinary action).

One case worthy of note is *International Brotherhood of Elec. Workers, Local Union No. 1377 v. Leece-Neville Div., Sheller-Globe Corp.*, 550 F.Supp. 1071 (N.D.Ohio 1982). In that case, the arbitrator concluded that the employees were guilty of stealing company property. The collective bargaining agreement gave

management the authority to issue rules and regulations governing its work force, and allowed it to discharge or suspend employees for cause. Pursuant to this clause, the company issued a set of regulations that provided for the prompt discharge of any employee who stole company property. The court concluded that once the arbitrator found that the employees had stolen, the arbitrator had to order discharge, as provided in the plant regulations. Therefore, the court vacated the arbitrator's reinstatement of the employees.

Turning to the present case, the collective bargaining agreement between Bechtel and the union contains Article II: Management Rights. That article provides that:

1. The Unions understand that the Contractor is responsible to perform the work required by the Owner. Therefore, the Contractor has the complete authority and right to:

. . . . .

G. Require all employees to observe the Contractor's and/or Owner's rules and regulations not inconsistent with this Agreement.

H. Require all employees to observe all safety regulations prescribed by the Contractor and/or Owner and to work safety.

I. Discharge, suspend, or discipline employees for proper cause.

Article XXII of the collective bargaining agreement is entitled "Project Rules." It provides that Project Rules will be limited to safety and security. It further provides that "violation of these project rules and regulations is direct and just cause for disciplinary action, including immediate discharge subject to Article VII—Grievance Procedure."

Bechtel promulgated Project Rules, in accordance with the contract provision recited above. They provide, in pertinent part, that:

Violation of the following rules will result in disciplinary action. Disciplinary action may be in the form of reprimand, termination and/or prosecution. The list of rules and penalties are not intended to be all inclusive, but provide general guidelines to which all contractors and their employees performing work on the Fermi 2 site are required to conform. A standard termination notice will be used for all employees.

## CATEGORY I

An employee will be terminated and will not be eligible for rehire for the length of the project for violation of any rule in this category.

. . . . .

Sale, use, or possession of drugs on the project.

The final relevant provision is the grievance procedure set forth in Article VII of the collective bargaining agreement. It consists of four steps, the fourth of which is arbitration. The language describing the scope and extent of the arbitrator's jurisdiction reads as follows: "The Impartial Arbitrator shall only have jurisdiction and authority to determine the meaning, application of, or compliance with the provisions of this Agreement and shall not have jurisdiction or authority to add to or detract from or alter in any way such provision."

Having reviewed the legal rules and governing documents, the validity of Arbitrator Howlett's award may now be determined. The arbitrator's decision as to Howard Huffman will be discussed first.

### A. Howard Huffman

Arbitrator Howlett first noted that the Huffmans were discharged for "use or possession" of marijuana at work, in violation of the Project Rules. Opinion and Award at 2. He then examined the evidence connecting Howard Huffman to marijuana use or possession. This evidence consisted of Officer Stull's testimony that he saw Howard take an object from Eddie Evans, drop it on the ground, and step on it. He then turned to the question of possession. The arbitrator reviewed Michigan criminal law, and concluded that "possession" requires intent, which consists both

of knowledge of the character of the substance and conscious intent to possess it. He found that intent to possess had not been shown:

> It is possible that Howard Huffman inadvertently or with heedlessness took the object in his hand without intent to smoke it or otherwise take action with respect thereto. One can only conjecture what Howard Huffman may have done with the "object" between the time Stull left the window and entered the building, at which time, he testified, Howard Huffman's left hand came down, his left foot came up and down on top of the object. . . . The fact that Howard Huffman was present when his brother and Evans smoked a marijuana cigarette is not a rule violation.

*Id.* at 27. The arbitrator concluded that Howard had not violated the Project Rules. Accordingly, he set aside Howard's termination, ordered his return to work, awarded him back pay, and ordered that he be returned promptly to the list of union members eligible to work at the Fermi 2 Plant.

■ Arbitrator Howlett's decision as to Howard Huffman must be enforced. In finding that the term "sale, use, or possession of drugs" does not apply to Howard's conduct, the arbitrator was fulfilling his function of interpreting the collective bargaining agreement.[1] An arbitrator is free to consult outside sources such as statutory or case law to aid him in deciding mixed questions of law and fact, absent contract language to the contrary. *See, e.g., American Fed'n of Television and Radio Artists, Cleveland Local v. Storer Broadcasting Co.,* 745 F.2d 392, 398–99 (6th Cir.1984). Even if the arbitrator's analysis contains a factual or legal error, it will not be set aside if it is an honest decision reached after a full and fair hearing. *See, e.g., Coast Trading Co. v. Pacific Molasses Co.,* 681 F.2d 1195, 1198 (9th Cir.1982). An exception to this rule exists in cases where the arbitrator has displayed

a "manifest disregard of the law," which is more than "mere error in interpretation or application of the law." *Anaconda Co. v. District Lodge No. 27 of the Int'l Assoc. of Machinists and Aerospace Workers,* 693 F.2d 35, 37–38 (6th Cir.1982) (per curiam). As no "manifest error" has been shown here, this court must enforce the arbitrator's interpretation of the contract.

### B. *David Huffman.*

■ Arbitrator Howlett stated that a careful review of the evidence convinced him that David Huffman was smoking a marijuana cigarette. Opinion and Award at 27. He found the testimony of Officer Stull persuasive, and deemed the testimony of the Huffmans and Evans "not credible." *Id.* at 29. The arbitrator then discussed the penalty to be imposed on David Huffman. He found that Bechtel's removal of David from eligibility for rehire for the length of the Fermi 2 project was too harsh. The arbitrator commented that "[i]f David Huffman had admitted to Lieutenant Vandervoot or to the Company representatives through the Union representatives what he had done, I am certain the penalty of removal of eligibility for the length of the project would not have been visited upon him." *Id.* at 31. The arbitrator thought that David was guilty of only a minor infraction:

> Because the evidence persuades that David Huffman did not intend to smoke marijuana when he went to lunch in the fab shop, but rather, I am convinced, asked to smoke Evans' cigarette, the removal of eligibility for rehire during the length of the project is an unreasonable penalty. The evidence is that he smoked the cigarette briefly-probably one drag. On the other hand, it was David Huffman who acted, even though unthinkingly. Hence, any award of back pay would reward him for his mistake. The award will provide that at the beginning of the first payroll period following receipt of

---

**1.** Although the term "sale, use, or possession of drugs" is found in the Project Rules rather than in the collective bargaining agreement, Article XXII of the agreement incorporates the Rules by reference.

the opnion and award David Huffman is to be returned to the eligibility list. *Id.* The arbitrator did not discuss Bechtel's termination of David. This omission suggests that the arbitrator affirmed David's dismissal, but provided that he should be eligible for rehire when additional carpenters are needed at the Plant.

Arbitrator Howlett thus found that David Huffman violated the terms of the collective bargaining agreement by smoking marijuana on the job, but then concluded that eligibility removal was too harsh a penalty under the circumstances. In so doing, the arbitrator exceeded his authority by modifying the collective bargaining agreement. That agreement gives Bechtel "complete authority" to discipline or discharge an employee for cause, and provides that a violation of the Project Rules constitutes just cause. It does not say that Bechtel may only dispense a mild form of punishment when mitigating factors accompany a violation of the Project Rules. Thus, Bechtel had the right to impose any form of discipline, including discharge and ineligibility for rehire, on David Huffman.[2] The arbitrator's award as to David Huffman must therefore be vacated.

### III. *Detroit Edison's Interest as a Property Owner*

Detroit Edison intervened as a plaintiff in this action to protect its perceived rights as owner of the Fermi 2 Plant. Its request for relief comes into play only if this court enforces the arbitrator's award as to one or both of the Huffmans. Detroit Edison asks this court not to order the return of the Huffmans to the Fermi 2 site. It claims the right to deny both of the Huffmans any future access to the Plant. Because the arbitrator's award reinstating Howard Huffman must be enforced by this

court, it is necessary to discuss the impact, if any, that this opinion has on the rights of Detroit Edison.

Detroit Edison states that the owner of private property has the right to exclude others from the property, and that this right to exclude is implicit in the notion of ownership. *See, e.g., Kaiser Aetna v. United States,* 444 U.S. 164, 179–80, 100 S.Ct. 383, 392–93, 62 L.Ed.2d 332 (1979) ("[T]he 'right to exclude,' so universally held to be a fundamental element of the property right, falls within this category of interests that the Government cannot take without compensation.") (footnote omitted). The right to exclude has special importance in the context of a nuclear power plant. Detroit Edison has a duty to make and keep its plant safe, to protect both the people that work there and the general public. In order to obtain a license to operate from the NRC, Detroit Edison must comply with NRC regulations. These regulations mandate a physical protection system for the plant that permits only authorized activities within protected areas. *See,* 10 C.F.R. §§ 73.1 *et seq.;* 73.45(c) (1985).

Detroit Edison imposes tight controls on access to the Fermi 2 Plant to fulfill its safety responsibilities. According to Stuart Leach, Director of Nuclear Security for Detroit Edison, background checks are conducted on all employees whose duties entail access to the plant on a regular basis, including even deliverymen and repairmen. Access is denied to any person who is found not to be "reliable and trustworthy." Mr. Leach testified that individuals who had used or possessed marijuana in the past would not be deemed "reliable and trustworthy," and that employees had been denied access in the past on this basis. The company also has a policy of removing

---

**2.** The union argues that the collective bargaining agreement does not authorize Bechtel to terminate employees without eligibility for rehire. It reasons that this penalty is found in the Project Rules themselves, rather than in the contract, and that the contract limits the Project Rules to safety and security requirements. Thus, any penalties found in the Project Rules

are invalid. The union's argument ignores the "complete authority" over discipline imposed for just cause that the contract gives to Bechtel. "Complete authority" means that Bechtel may select the form of punishment, whether or not that punishment is mentioned in the Project Rules.

from the site any person who is caught possessing drugs or alcohol, confiscating the contraband, and withdrawing future access privileges from that person. Mr. Leach stated that employees of Detroit Edison and of contractors had been found using drugs on the job approximately fifty times in the past, and that these employees were always escorted off of the Plant and denied future access privileges.

According to Detroit Edison, Arbitrator Howlett's reinstatement of Howard Huffman does not affect its right to exclude him from Fermi 2. Some authority supports Detroit Edison's position. In *Cafeteria and Restaurant Workers Union, Local 473 v. McElroy*, 284 F.2d 173 (D.C.Cir. 1960), *aff'd*, 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961), the Department of Defense maintained a Naval Gun Factory. M & M Restaurants operated a restaurant at the Factory that employed plaintiff, a short order cook. M & M had signed a labor contract with the plaintiff union, agreeing to discharge employees only for just cause. The dispute began when Factory security officials confiscated plaintiff's identification badge. They had determined, for an undisclosed reason, that plaintiff did not meet Factory security requirements. As a result, plaintiff could not enter the Factory and continue her employment at the restaurant.

The Court of Appeals for the District of Columbia Circuit first found that the Government had the right to control access to a naval gun factory. It then found that the only right that plaintiff had to enter the Factory was the right she obtained through her employment contract with the restaurant. As the restaurant was subject to the access limitations imposed by the security needs of the Government, the plaintiff was also subject to these limitations. "If the rights of a contractor-employee are subject to limitations, the rights of employees under the contract are sub-

ject to the same limitations." 284 F.2d at 180 (footnote omitted).

The court then found that the right to employment was qualified, and that an employee has virtually no rights at all in the situs of employment, absent a special contract or a total debarment from an occupation. *Id.* at 181–82. It also concluded that the Government was not liable for interfering with an employment contract, as the Government was merely exercising a right "clearly equal to, or greater than" whatever right to work that the plaintiff was asserting. *Id.* at 184. Next, the court considered the liability of the restaurant, which could only discharge plaintiff for cause. The court reached two conclusions: first, the restaurant did not discharge the cook because it offered her employment at another location; and, second, even if the restaurant had discharged the cook, it would have had good cause for so doing because the Government refused to allow her entry to the Factory.[3]

Another relevant case is *Howard P. Foley Co. v. International Brotherhood of Elec. Workers, Local 639*, No. CV 84–8343–ER(JRx) (C.D.Cal. Jan. 31, 1985). In *Foley*, the owner of the Diablo Canyon Nuclear Power Plant, PG & E, denied a worker represented by the plaintiff union access to the Plant because of suspected drug use on the job. Foley, the employer of union member Edward Thomas, then terminated Thomas because he was barred from the Plant. The union filed a grievance against the employer Foley, which proceeded to arbitration. The union conceded that the arbitrator lacked the authority to force PG & E to admit Thomas to the Plant, but asked for sanctions against the employer. The arbitrator concluded that Foley had no "just cause" to terminate Thomas, as required by the collective bargaining agreement. Instead of ordering reinstatement, the arbitrator ordered Foley to pay Thomas for six months of lost earnings.

---

**3.** The Supreme Court affirmed the Court of Appeals in *McElroy*. The Court held that the Government had the right to control access to the Gun Factory. It also held that due process was not offended by the manner in which access was denied to the plaintiff.

The case then proceeded to the district court, which held that the arbitrator imposed an impermissible penalty on Foley by forcing it to pay lost wages. The court found the lost wage payment to constitute a penalty because Thomas was barred from the jobsite by PG & E, not by Foley. As the collective bargaining agreement did not provide for the imposition of such a penalty, the arbitrator exceeded his authority. The court agreed with the arbitrator that Foley lacked "just cause" to terminate Thomas, but concluded that no remedy existed for this breach of the collective bargaining agreement.

*McElroy* directly suggests, and *Foley* indirectly suggests, that Detroit Edison has the right to deny access to employees of contractors working at its nuclear power plant. This right is superior to, and is unaffected by, the rights that stem from the collective bargaining agreement between the contractor and its employees. This means that Arbitrator Howlett's reinstatement of Howard Huffman, and this court's enforcement of that award, does not bind or affect Detroit Edison in any way.

The union raises an argument not addressed in either *McElroy* or *Foley*. It contends that Detroit Edison is bound by the collective bargaining agreement between Bechtel and the union, because Bechtel and Detroit Edison are "joint employers" of the union members. If Detroit Edison is bound by the collective bargaining agreement, it must allow Howard Huffman to return to work. Under this analysis, Detroit Edison agreed to terminate the Huffmans only for just cause, and no just cause was found as to Howard Huffman.

■ The analysis of four factors determines whether or not two companies are joint employers. The factors are the interrelation of operations between the companies, common management, centralized control of labor relations, and common ownership. *Metropolitan Detroit Bricklayers Dist. Counsel, Int'l Union of Bricklayers and Allied Craftsmen v. J.E. Hoetger & Co.*, 672 F.2d 580, 584 (6th Cir.

1982) (citation omitted). All four factors need not be present. *Id.* In this case, the union concentrates on the third factor. It argues that Detroit Edison and Bechtel are joint employers because they share or codetermine the essential terms of employment. *See, e.g., Boire v. Greyhound Corp.*, 376 U.S. 473, 481, 84 S.Ct. 894, 898, 11 L.Ed.2d 849 (1964).

■ The union relies on several aspects of Detroit Edison's relationship with Bechtel and its employees to support its argument. First, it points out that Detroit Edison determines whether an employee of Bechtel is trustworthy enough to work at the Plant. Detroit Edison also controls Bechtel's employees by denying future Plant access to anyone caught using or possessing drugs on the job. Second, Detroit Edison obtained and provided all of the evidence against the Huffmans, and its counsel worked with Bechtel to prepare for the arbitration hearing. Third, the union relies on the portions of the contract between Detroit Edison and Bechtel that it has obtained through discovery. It states that Detroit Edison required Bechtel to execute the "General President's Agreement," which is the collective bargaining agreement governing this dispute. The General President's Agreement requires Bechtel employees to obey all Detroit Edison safety rules and regulations, and all other Detroit Edison rules not inconsistent with the agreement. The union concludes that these facts establish Detroit Edison's control over essential terms of employment, thereby rendering Detroit Edison a joint employer of Bechtel's employees.

Detroit Edison denies that it is a joint employer. It argues that it lacks sufficient control over the essential terms of the Huffmans' employment:

It is factually undisputed that the Huffman brothers were hired by Bechtel—not Detroit Edison. Not only the labor agreement itself, but custom and practice as well, recognize that job applicants are referred to Bechtel by the Carpenters local union hiring hall. The Huffman brothers' wages were paid by Bechtel—not Detroit Edison. The Carpen-

ters responded by filing a grievance with Bechtel—not Detroit Edison. The testimony of Stuart H. Leach, Detroit Edison's Director of Security, which testimony was uncontroverted, indicates that where an employee violates security rules, the contractor is so advised but Detroit Edison does not direct Bechtel to discharge the individual. Indeed, Detroit Edison has no interest whatsoever in the existence or continuation of the employment relationship, *per se*. Bechtel may do whatever it wants to as a separate and independent employing entity in regard to the continued employment of the Huffman brothers.

Brief of Detroit Edison at 26–27. Detroit Edison also denies that its control over plant access, which is essential for employment, makes it a joint employer. It points out that the union's logic would make it the employer of *every* person who enters the site, to the extent that the person's employment would be affected by a loss of access.

Detroit Edison's degree of control over Bechtel's employees resembles the control present in the *J.E. Hoetger & Co., supra*. There the Court of Appeals for the Sixth Circuit addressed the argument that a contractor, Hoetger, was the joint employer of the employees of one of its subcontractors, Hawkins. The union argued that Hoetger controlled some of the essential terms of employment. The subcontract between Hoetger and Hawkins required Hawkins to hire only union labor. It further provided that while Hawkins would pay all union benefits earned by the workers, Hoetger reserved the right to escrow any available funds to ensure that these payments were made. The court concluded that the degree of control Hoetger exercised over Hawkins' labor relations was insufficient to establish a joint employer relationship. 672 F.2d at 584. It reasoned that:

> There is no showing in the record that Hoetger exercised any day-to-day control over Hawkins's relations with its employees. Although the subcontract between Hoetger and Hawkins required that only Union members be hired, there is no showing that any actual hiring or firing decisions were made by Hoetger. In ad-

dition, there is no showing that Hoetger supervised Hawkins's employees in the performance of the work.

*Id.* at 584–85.

As in *J.E. Hoetger & Co.,* Bechtel made the hiring and firing decisions as to its employees. There is no showing that Detroit Edison provided any day-to-day supervision of the employees' work performance. Detroit Edison's involvement with these employees almost exclusively relates to its enforcement of safety and security requirements that are an indispensable part of maintaining a nuclear power plant. This degree of control is insufficient to make Detroit Edison a joint employer of Bechtel's employees.

The union argues that a ruling on the joint employer issue would be premature. It asks for time to conduct further discovery to uncover additional support for its position. The union complains that Detroit Edison and Bechtel have refused to furnish it with a complete copy of the contract between them. Detroit Edison and Bechtel contend that they have already provided all relevant portions of the contract.

Detroit Edison intervened in this case and raised the issue of its relationship with Bechtel's employees over eight months ago. The union thus had an opportunity to conduct discovery and build a record in this case. The record, as it now stands, supports Detroit Edison's claim that it is not a joint employer. However, at least one dispute about the scope of discovery is currently unresolved. The court wants to ensure that all facts relevent to Detroit Edison's status as a joint employer are before it. Therefore, the court finds that the present record indicates that Detroit Edison is not a joint employer of Bechtel's employees, including Howard Huffman. This holding will be reconsidered in light of any additional facts that the parties submit to the court within sixty (60) days of the date of this memorandum opinion and order.

## IV. *Union's Motion for Attorney's Fees*

■ The union asks the court for an award of its attorney's fees incurred in

enforcing Arbitrator Howlett's award. It cites authority holding that a union is entitled to fees and costs incurred in enforcing an arbitration award, when the employer unjustifiably or in bad faith refuses to comply with the award. *See, e.g., Int'l Union of Petroleum and Indus. Workers v. Western Indus. Maintenance, Inc.,* 707 F.2d 425 (9th Cir.1983). As the record in this case reveals no bad faith or unjustifiable conduct by any of the parties, the union's motion is denied.[4]

### V. *Conclusion*

The opinion and award of Arbitrator Howlett is hereby enforced as to Howard Huffman and vacated as to David Huffman. Nothing in this opinion and order restricts Detroit Edison's right to exclude Howard Huffman or any other person from the Fermi 2 Plant. If additional facts are submitted within sixty (60) days, the court will reconsider the argument that Detroit Edison is a joint employer of Howard Huffman and is thereby obliged to allow him access to the Plant. The union's motion for an award of attorney's fees is denied.

SO ORDERED.

---

**4.** This holding makes it unnecessary to consider Bechtel's argument that the Sixth Circuit does not allow awards of attorney fees in § 301 actions to enforce arbitration awards. *See Buckeye Cellulose Corp. v. District 65, Div. 19, United Auto Workers,* 689 F.2d 629, 631 (6th Cir.1982).